## APPEAL OF THE ROCKFORD MALLEABLE IRON WORKS.

Docket No. 2451.   Submitted July 13, 1925.   Decided October 6, 1925.

1. Evidence *held* insufficient to establish March 1, 1913, value.
2. Where taxpayer keeps his books on the accrual basis and supplies, etc., are ordered before, but delivered after, the close of the fiscal year, accounts payable should be credited therefor and there should be an offsetting debit to inventory.

*C. J. Maguire, Esq.*, and *Albert E. Ford, Esq.*, for the taxpayer.
*Ellis W. Manning, Esq.*, for the Commissioner.

Before STERNHAGEN, LANSDON, GREEN, and LOVE.

This is an appeal from the determination of a deficiency in the sum of $9,853.94 for the fiscal years ended June 30, 1917, and June 30, 1918. The taxpayer contends that the Commissioner erred in rejecting, for depreciation purposes, the March 1, 1913, value of the taxpayer's assets, and that he erred in refusing to allow as deductions for the fiscal year ended June 30, 1917, the sum of $2,881.27, and for the fiscal year ended June 30, 1918, the sum of $5,718.45, the Commissioner having in each instance treated such sum as being deductible in the preceding taxable year.

### FINDINGS OF FACT.

The taxpayer is an Illinois corporation with its principal office in the City of Rockford. It is engaged chiefly in the manufacture of various sorts of malleable-iron castings. From 1907 until 1916 the principal part of its products were castings used upon freight cars and locomotives and castings used in agricultural work. In 1916 the railroad work fell off and the company took up the manufacture of castings for automobiles, and continued manufacturing the automobile castings in increasing numbers during the year in question. The automobile castings were more difficult to make and required considerably more care than did the railroad castings. During 1917 and 1918 the business of the company increased rapidly, and it was necessary to operate the various plant facilities with unskilled and

untrained help, to the detriment of certain of the plant facilities so used. The company expended in the fiscal year ended June 30, 1917, the sum of $30,151.64, and in the fiscal year ended June 30, 1918, the sum of $27,088.55, in plant equipment and fixtures. The production of castings, in tons, was as follows:

| | Tons. |
|---|---|
| 1914 | 8, 272. 68 |
| 1915 | 5, 369. 06 |
| 1916 | 10, 660. 90 |
| 1917 | 12, 289. 70 |
| 1918 | 11, 180. 88 |

From the evidence adduced we find that the exhaustion, wear and tear of the taxpayer's assets for the years in question, expressed in terms of percentage, is as follows:

| | Per cent. |
|---|---|
| Buildings | 3. 1 |
| Department machinery | 12 .0 |
| Power house | 5. 0 |
| Permanent fixtures | 5. 5 |
| Office fixtures | 10. 0 |
| Auto trucks | 20. 0 |

It was the practice of the taxpayer to take its inventory at the close of its fiscal year. Coal, other supplies, and equipment ordered by it prior to the close of the fiscal year but not delivered to it until after the close of the fiscal year were not included in the inventory. When the coal, supplies, etc., were received the purchase price thereof was credited to accounts payable. The Commissioner determined that these items should have been accrued by the taxpayer in the previous fiscal year, and accordingly transferred them to the previous year. No adjustment of inventory was made by the Commissioner to offset the items thus transferred. The purchases were, in the main, coal and supplies of various kinds, and there were also numerous items of freight. The total of the items transferred from the fiscal year ended June 30, 1917, to the preceding fiscal year, as evidenced by an exhibit itemizing them, was $806.90, and the items transferred from the fiscal year ended June 30, 1918, to the preceding fiscal year totaled $4,217.16.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on consent or on 10 days' notice, in accordance with Rule 50.

### OPINION.

GREEN: The taxpayer sought to prove the March 1, 1913, value of its depreciable assets by the introduction of a retrospective appraisal.

As a preface to the summary of the appraisal the appraisal company attached the following statement:

In connection with our Detailed Retrospective Appraisal Report of your properties located at Rockford, Illinois, we submit herewith a Depreciated Summary based on and to be used in connection with said Detailed Report.

Reproductive Values March 1st, 1913, are taken from the Detailed Report. Annual Rates of Depreciation are based on estimated serviceable life of asset and Accrued Depreciation March 1st, 1913, is calculated by multiplying age of asset in years at that date by annual depreciation rate. The Net Appraised Value March 1st, 1913, represents the Reproductive Value less the Amount of Accrued Depreciation.

A summary by groups of depreciable assets on Income Returns is presented and the balanced average annual rate of depreciation is shown for each group as well as the Reproductive Value, Amount of Accrued Depreciation and New Appraised value March 1st, 1913.

If we assume that the above statements are true, and the appraisal is useless unless we do indulge in such assumption, we have not the March 1, 1913, *value*, but, instead, we have "the reproductive value less the amount of accrued depreciation." In the *Appeal of The Kinsman Transit Co.*, 1 B. T. A. 552, we indicated our disapproval of such methods of proving value. We there said:

We think that *as evidence of value*, where the reconstruction cost less depreciation is used, that cost, less *actual* depreciation sustained, more nearly represents the *actual value* at a given time than a formula or flat rate based upon useful life, if arbitrarily applied. Both methods employed are open to serious objections in ascertaining value as of March 1, 1913, and the application of either method, without evidence to show that it fairly represents the depreciation actually sustained, may lead to unjust results to the one party or the other. It is our opinion that in determining value as of a particular date of property of the character herein, cost less theoretical depreciation, or reconstruction cost less theoretical depreciation, does not necessarily prove either the actual or market value and may not even approximate such values.

In the *Appeal of Valley Steamship Co.*, 1 B. T. A. 1107, wherein the *Kinsman Transit Co. Appeal, supra,* was quoted with approval, we indicated again that value was a question of fact, and endeavored to point out some of the evidence which we regarded as essential in establishing a March 1, 1913, value. The value of property on March 1, 1913, is its *actual value* on that date, and that valuation can not be determined by any sort of theoretical computation, even though that theoretical computation starts with a reproductive value based upon cost of similar property. Value is a real, actual, definite thing, and, in many instances, cost or depreciation, or both, have very little to do with it. Value is what the property is worth. It is what it would bring in the open market if offered for sale by an owner willing, but not compelled, to sell to a purchaser willing, but not compelled, to buy. Value is frequently affected by things far removed from depreciation or cost. For example, the buildings

and equipment of an abandoned coal mine are practically worthless. Such buildings and equipment could be made to show a very substantial value if that valuation were determined by taking a reproductive value less the amount of accrued depreciation. The value of a street railway may be materially increased or decreased by the construction of a new steam railroad station or by the destruction by fire of the buildings of a suburban amusement park. The value to-day of a munitions plant constructed in 1918 may be one-tenth of its 1918 value. However, if its value were computed according to the appraisal company's methods, we would have the 1918 value less accrued depreciation.

Value results largely from demand or earning power, which may or may not be the same thing. It is commonly affected by periods of prosperity or financial depression.

If the taxpayer's buildings were poorly planned or laid out, or if the arrangement of the machinery were such as to reduce the efficiency of the plant, the value would be materially reduced although the reproductive cost would be the same.

The representative of the appraisal company, on the witness stand, testified as follows:

Q. Do you have any idea what those assets would have sold for on the open market to a willing buyer on March 1, 1913?

A. Any opinion that I would have would be a wild estimate.

Q. You did not take into consideration in your appraisal the question of marketability of such assets on that date?

A. No, sir.

Q. There is no relation between the appraised value you have determined as of March 1, 1913, and the depreciated cost of these assets, is there?

A. We did not go into the cost whatever.

Q. You have no information, and no information was given you what this property was worth, the amount at that time?

A. No, sir.

Q. Did you make any inquiry into the surrounding circumstances?

A. As to the sale value?

Q. Yes.

A. No, sir.

Q. What information did you use in determining the estimated life?

A. We used information or data which we had collected in that line which is in line with standard authorities of the estimated life for this equipment, as set up by standard authorities.

Q. That would presuppose that continuity of average conditions?

A. Yes. The life we set up is an average serviceable life under normal working conditions. It does not give weight to obsolescence or anything that might occur at that time. We endeavor to set up these estimates as if we were making this appraisal at March 1, 1913, and did not take into consideration anything that might have happened subsequent to that date.

Q. Would it have taken any consideration of the fact, if it occurred, that prior to March 1, 1913, any particular machinery or class of machinery had been employed for any extraordinary number of hours a day; in other words,

if there had been extraordinary deterioration prior to March 1, 1913, in any particular machinery or class of machinery, would your appraisal have been based upon that fact?

A. You mean would our accrued depreciation reflect that fact of March 1.

Q. Yes.

A. No, sir; we had nothing like that brought to our attention.

Q. And it did not then take into consideration or purport to take into consideration any of the actual conditions of the property on March 1, 1913?

A. On March 1, 1913—it simply—the depreciation is based entirely on an average normal life.

Q. You did not know what the condition was on March 1, 1913?

A. We had no way of knowing.

Q. The answer is you did not know.

A. Yes.

The appraisal offered in evidence by the taxpayer was admitted in evidence over the objection of counsel for the Commissioner, and, in so admitting it, we said, "We will take it for what it is worth." Such appraisals are entitled to little if any weight. They may serve a useful purpose in that they are a list or inventory of the assets and if used as corroborative evidence may to a limited extent help in establishing value. The appraisal in this appeal constitutes the taxpayer's sole evidence as to March 1, 1913, value, and, as we have above indicated, an appraisal of this nature is so utterly unreliable that it can not serve as a basis for overturning the Commissioner's valuation.

The depreciation rates set out above we believe to be established by the evidence, and they should be used by the Commissioner in determining the deductions allowed for the years 1917 and 1918.

The taxpayer's position as to the accounting procedure to be followed is correct. Where the books of account are kept on an accrual basis and "accounts payable" is credited for merchandise ordered prior to the close of the fiscal year for delivery within a reasonable time thereafter, there should be on the books for the same fiscal year a corresponding debit to "inventory."